STATE OF MAINE                                        SUPERIOR COURT
CUMBERLAND, SS                                        DOCKET NO. AP-05-034

SEAFORTH HOUSING, LLC

        Plaintiff

        vs.                                          ORDER ON 80B APPEAL

CITY OF PORTLAND

        Defendant

and

WATERVIEW DEVELOPMENT, LLC

        Party-in-interest

Before the court is Plaintiff Seaforth Housing, LLC's ("Seaforth") appeal,

pursuant to M.R.Civ.P. 80B, of the City of Portland Planning Board's ("Board")

approval of party-in-interest Waterview Development, LLC's ("Waterview")

application for development of a condominium building.

## BACKGROUND

Seaforth owns Back Bay Tower, a fifteen-story condominium building in

Portland situated on Cumberland Avenue, across Mechanic Street from the

Waterview development site. The Waterview development, as approved by the

Board, will have twelve stories, 94 residential units, and 144,000 square feet of

space. On February 28, 2005, Waterview submitted an application to the Board

for final site plan and subdivision approval, which was approved by the Board

after a public hearing, in a decision dated May 10, 2005. On June 8, 2005,

1

Seaforth filed an appeal from this decision, and on June 28, 2005, filed a motion for a stay, which was denied. The court now considers Seaforth's appeal.

On appeal, Seaforth contends that the Board erred with respect to its final site plan and subdivision approval in finding that (1) Waterview has adequate financial capacity to complete the proposed development, (2) the project minimizes, to the extent feasible, any substantial diminution in the value or utility to Back Bay Tower (3) Waterview's application satisfied traffic requirements (4) Waterview complied with the parking space requirement and (5) the proposal would not cause significant wind impact.

In addition, Seaforth maintains in its appeal briefs that it did not receive notice of any of the proceedings before the Portland City Council. These proceedings resulted in the City Council's approval of a Contract Zone Agreement, a necessary step in Waterview's process of obtaining final site plan and development approval from the Board. However, in its motion to strike certain portions of the appeal record submitted by Waterview, Seaforth also maintains that it "is only appealing the [May 10] decision on the February 28, 2005 application. Plaintiff is not seeking to challenge the Contract Zone Agreement between the City and Waterview." Plaintiff's Motion to Strike Portions of "Record" with Incorporated Memorandum of Law at 2. Thus, by Seaforth's own admission, the Contract Zone Agreement is not challenged, and any question of adequate notice with respect to hearings held on the Contract Zone is waived. Accordingly, Seaforth's claims that it did not receive notice of these hearings will not be reviewed.

2

# DISCUSSION

## I. The Board's Findings Concerning the Adequacy of Waterview's Proposal

The Board's site plan and subdivision approval is governed by state statute and by the provisions of the City of Portland Land Use Ordinance ("Ordinance"). 30-A M.R.S.A. § 4404. The court reviews the Board's decision for errors of law, abuse of discretion, or findings of fact not supported by substantial evidence in the record. *See York v. Town of Ogunquit*, 2001 ME 53, ¶ 6, 769 A.2d 172, 175.

### A. Financial Capacity

Seaforth claims that Waterview did not meet the requirements of Ordinance § 14-525(c)(9).[1] Waterview had submitted to the Board a letter from Key Bank stating that it has a strong interest in proceeding with financing the project in the amount of $20,000,000. In addition, Waterview submitted a cover letter to the Planning Board describing the scale of the project and stating that the estimated construction cost is $17,000,000. These submissions appear to cover the statutory requirement under § 14-525(c)(9). Although § 14-525(c)(9) requires a letter from a responsible financial institution stating that it "would seriously consider financing" the development and Key Bank's letter states that it has a "strong interest" in financing the development, these phrases indicate similar levels of interest. § Thus, the substance of § 14-525(c)(9)'s requirement is met.

---

[1] Ordinance § 14-525(c)(9) states:
[For] all site plans ... the applicant shall ... provide written statements containing the following:
(9) evidence of financial and technical capacity to undertake and complete the development including, but not limited to, a letter from a responsible financial institution stating that it has reviewed the planned development and would seriously consider financing it when approved, if requested to do so.

Seaforth claims, however, that Waterview was also required to present evidence of the actual costs of completing the project, for comparison against the amount the financial institution would be willing to finance. *Bruk v. Town of Georgetown*, cited by Seaforth to support this assertion, is inapposite. *See* 436 A.2d 894, 897 (Me. 1981). In *Bruk*, the court was considering whether a Board's *denial* of a proposed subdivision was supported by substantial evidence in the record. The Law Court upheld the Board's decision in part because it was supported by its finding that the developer had not tallied costs associated with the project in a way that satisfied the Board that the developer had adequate financial capacity to cover those costs. *See id.*, n. 5. This opinion merely reaffirms that a planning board has broad discretion to make factual findings, and that the findings will not be overturned by the court on appeal if they are supported by substantial evidence in the record. *See id.* This opinion does not add to the minimum requirements for approval as stated in 30-A M.R.S. § 4404(10)[2] and Ordinance § 14-525(c)(9). Under these requirements, the Board was entitled to find, based on Waterview's presentation of the scale and total estimated cost of the project, as well as the letter of strong interest from Key Bank, that Waterview had demonstrated adequate financial capacity to complete the development. *See id.*

B. *Diminution In Value or Utility to Neighboring Structures*

---

[2] 30-A M.R.S.A. §4404(10) states:
> When adopting any subdivision regulations and when reviewing any subdivision for approval, the municipal reviewing authority shall consider the following criteria and, before granting approval, must determine that:
> (10) the subdivider has adequate financial and technical capacity to meet the requirements of this section;

Seaforth claims that Waterview did not satisfactorily demonstrate that its development had minimized, to the extent feasible, any substantial diminution in the value or utility to neighboring structures. *See* Ordinance § 14-526(a)(4).[3] The Board's Decision includes a detailed explanation for its finding that the Waterview development *does* meet this requirement. Without reprinting the entire text of this explanation, the Board noted, significantly:

> Comments were received on behalf of Seaforth, which asserted that the Project's height and mass will cause a $1.4 million diminution of value to its property. Seaforth failed to present any documentation or rational analysis to support this statement.

Board Decision at 8. Seaforth asserts that its testimony before the Board was supported by rational analysis, and points to its written submission to the Board as well as the testimony of its financial director, Caskie Collett. Ms. Collett stated that Seaforth has received to date seven notices to vacate units, and that Seaforth has re-leased five of those spaces, at an average decrease in rent of about $300. *See* R. at 21. The Board, however, found this evidence unpersuasive. The Board did not abuse its discretion in choosing to believe that the asserted diminution in value was either not related to the proposed development, or not proven to be substantial. Moreover, the Board was well within its discretion to weigh Seaforth's assertions against what it considered to be the "high quality" and "attractive design" of Waterview, which "would actually enhance local property values." *See* Board Decision at 8. Accordingly, the Board did not err in concluding that the Waterview Development minimizes, to the extent feasible,

---

[3] Ordinance § 14-526(a)(4) states:
The Planning Board ... shall not approve a site plan unless ... (4) The bulk, location or height of proposed buildings and structure minimizes, to the extent feasible, any substantial diminution in the value or utility to neighboring structures under different ownership and not subject to a legal servitude in favor of the site being developed;

any substantial diminution in the value or utility to neighboring structures. *See Twigg v. Town of Kennebunk*, 662 A.2d at 916 (stating that a board's decision is not wrong because the record is inconsistent or a different conclusion could be drawn from it.)

### C. Traffic Requirements

Before approving a site plan application, the Planning Board must find that the Project will not cause "unreasonable highway or public road congestion or unsafe conditions with respect to use of the highway or public roads existing or proposed." Ordinance § 14-497(a)(5). In addition, the Board must find that the incremental volume of traffic will not create or aggravate any significant hazard to safety, at or to and including intersections in any direction where traffic could be expected to be impacted. Ordinance § 14-526(a)(1).

The record shows that the Board had before it a detailed traffic study issued by Waterview's expert, Gorrill-Palmer Consulting Engineers, Inc.; reviews of the Gorrill-Palmer study by the City's Consulting Traffic Engineer, Thomas Errico; a Planning Board Report prepared by City Planner Barbara Barhydt, discussing Mr. Errico's conclusions on traffic; and a presentation by William J. Bray, Seaview's traffic expert, critiquing the Gorrill-Palmer study. From these various sources of information, the Board may accept some expert opinions and reject others. *See Mack v. Municipal Officers of Town of Cape Elizabeth*, 463 A.2d 717, 729 (Me. 1983). Seaview's assertion that the Board was required to analyze all of Mr. Bray's comments in order to make the required findings under the Ordinance is mistaken. *See id., see also Glasser v. Northport*, 589 A.2d 1280, 1283 (Me. 1991). The Board had more than enough evidence to conclude that the plan

before it would not result in unsafe traffic conditions or aggravate any hazard to safety, and it was not required to address in its Decision all of the contradictory evidence put before it in order to come to its conclusion. *See id.*

Seaview contends that Mr. Errico never approved the Gorrill-Palmer study[4] as stated in the Board's Decision; however, the Board may logically conclude that the comments Mr. Errico did make about the study after stating that he had reviewed the site plan and supporting traffic and parking information, set forth the only difficulties or disagreements he had with it. *See* Exhibit 22, attachment F. It appears from the Board's Decision that all of Mr. Errico's comments except two were fully dealt with by the Board. Without acting capriciously and based on substantial support in the record, the Board concluded Mr. Errico had "opined that the applicant's traffic management plan and proposed improvements meet all of the City standards, subject to certain conditions." Board Decision at 2.

The two points in Mr. Errico's commentary that are left unaddressed by the Board are as follows:

> (3) Bituminous stamped crosswalks are proposed across the project's driveway. Specifications of the method to be used should be reviewed and approved by me and Eric Labelle
> (4) The underground parking garage will be very tight for vans entering and exiting the designated areas. The applicant should provide information that documents the ability to make the required parking maneuvers.

---

[4] The Study, for its part, concludes clearly that the proposed construction presents no traffic problems: the Executive Summary of the Study notes, "It is the opinion of Gorrill-Palmer Consulting Engineers, Inc. that the local roadway network can accommodate the additional traffic generated by the proposed Waterview Apartments and that the proposed parking supply is adequate."

Although these comments were undoubtedly intended by Mr. Errico to increase the traffic-related safety of the development, it was within the Board's discretion under the Ordinance to find that, if these particular points were left unaddressed, the plan as proposed would still comply with the Ordinance's traffic requirements. The Board is charged by the Ordinance with finding that the project will not create unsafe conditions with respect to use of public roads. Ordinance § 14-497(a)(5). The difficulty with the parking garage does not relate to an unsafe condition with respect to use of public roads. Rather, it seems to relate to a potential liability on the part of Waterview, which the Board could reasonably have anticipated Waterview would address without the Board issuing an instruction to do so. Likewise, a recommendation that Mr. Errico and Mr. Labelle review the method of stamping a crosswalk can be reasonably understood by the Board as not pertaining to unsafe conditions with respect to use of public roads, but rather as a suggestion by Mr. Errico that Waterview consult with him for its own benefit. Accordingly, the Board's finding that the project will not cause unreasonable highway or public road congestion or unsafe conditions with respect to the use of the highway or public roads, subject to conditions as outlined in the Board Decision, is reasonable and based on substantial evidence in the record.

### D. Parking Space Requirement

The Conditional Zone for Waterview's 96 units, established by the Board prior to the May 10, 2005 meeting, requires a minimum of 119 spaces. Ordinance

§ 14-526(a). [5] Seaforth does not contest the adequacy of this number as an acceptable ratio of parking spaces-to-dwelling units. Rather, Seaforth contends that Waterview had not adequately demonstrated that it in fact has acquired the required number of spaces under the Conditional Zone, and that the Board exceeded its authority in granting final site plan and subdivision approval without first holding Waterview to the parking requirement established by the Conditional Zone.

The Board Decision states, "In addition to the 9 spaces on-site, the Applicant recently acquired an option to purchase the Gateway Garage and is proposing to provide all of the 110 required parking spaces within this structure." Waterview had submitted a copy of the option to purchase Gateway Garage, which indicates that Waterview has an unconditional option to purchase the Gateway Garage.

Seaforth maintains, however, that the Board tacitly acknowledged that Waterview had not met the parking requirement by imposing the additional condition that, post-construction and prior to the City's issuance of a certificate of occupancy, Waterview would be required to present additional evidence that the required parking spaces are available. This is one plausible interpretation of this requirement. Another, equally plausible interpretation is that the Board was satisfied that Waterview had met the parking requirement but that it considered it prudent to impose further requirements on the applicant, to be met at future

[5] Ordinance § 14-526(a) states in part:
(1) The Planning Board ... shall not approve a site plan unless it meets the ... provisions for parking.
(2)(b) Where construction is proposed of new structures having a total floor area in excess of fifty thousand (50,000) square feet, the Planning Board shall establish the parking requirement for such structures. The parking requirement shall be determined based upon a parking analysis submitted by the applicant, which shall be reviewed by the city traffic engineer, and upon the recommendation of the city traffic engineer.

9

dates when the projections made by various persons involved in the project would come to fruition. Such is the case with the Board's requirement that the applicant monitor the intersection at Mechanic Street and Cumberland Avenue post-development, and, in the event the already-implemented traffic improvements were not sufficient, that Waterview provide up to $25,000 in additional improvements. As a matter of law, the court cannot say that the Board's post-development requirement that Waterview provide additional evidence of parking is any different than its post-development traffic-monitoring requirement.

### E. Wind Impact

Finally, Seaforth claims that the Board lacked sufficient evidence to conclude that the Waterview development would not cause a significant wind impact, and appears to argue that the Board abused its discretion in not ordering a wind impact study. Ordinance § 14-526(a).[6] A review of the record establishes that this contention is without merit. The Ordinance allows the Board to order a wind impact study, but does not require such a study in every instance. § 14-525(a).[7] Only when the Board, in its discretion, finds that it is reasonably

---

[6] Ordinance § 14-526(a) states in part:
The Planning Board ... shall not approve a site plan unless it meets the following criteria: ...
(3) The bulk, location or height of proposed buildings and structures and the proposed uses thereof will not cause health or safety problems as to existing uses in the neighborhood, including without limitation health or safety problems resulting from any substantial reduction in light and air, any significant wind impact, and any significant snow loading on any neighboring structure, where setbacks from property lines are not required by article III.

[7] Ordinance § 14-525(a) states in part:
Notwithstanding the submission of a complete application, any applicant shall delineate on the plan or supply such other information, studies or reports from qualified professionals when determined by the Planning Board or the planning authority to be reasonably necessary to make any of the determinations required by this article, or to impose or effectuate conditions which may be imposed pursuant to section 14-526 including, without limitation: ... an analysis of wind impacts on surrounding properties.

necessary to make a determination about the wind impacts will it order such a study. *Id.* The court will not second-guess the Board's decision not to order a wind impact study or its conclusion that the Waterview development would not cause significant wind impacts where there is record evidence to support that decision. *See Twigg v. Town of Kennebunk,* 662 A.2d at 916.

The record shows that the Board was presented with evidence of the Waterview development's façade variation and breakup as a means of reducing wind impact, R. at 24-5; that wind nuisance to pedestrians is related mainly to the ability to open doors around negative wind pressure, which is greatest at the corners of buildings, and that, consequently, all doors in the Waterview are located in the center of the building, R. at 25; and that the building's designers confined the size of the building they were designing in an attempt to address wind impacts. *Id.* In addition, the Board was aware that the Waterview, a 12-story building, was being built next door to an existing 15-story building. The information provided by the City's downtown urban guidelines, presented by Seaforth as a reason that the Board should have required a wind impact study, seems just as likely to reassure the Board that none was necessary in this case. It states:

> In general, the taller the building, the stronger the wind potential is at the building's base. Monolithic buildings, those that do not change shape with height, almost invariably will be windy at their base when they are significantly taller than most of the surrounding buildings. When there are a lot of buildings of similar height in an area, the buildings tend to shelter one another.

Based on the above-related evidence, the Board determined that "the project building is to be located near the existing Back Bay Towers building and may actually lessen wind impacts associated with that currently single tall structure."

This finding is based on substantial evidence in the record, and the Board did not abuse its discretion in finding that no additional evidence in the form of a wind-impact study was required in order for it to make this determination.

Therefore the entry is:

> The Portland Plannning Board's approval of Waterview Development LLC'S Application for Site Plan and Subdivision Approval is AFFIRMED.

Dated at Portland, Maine this ___13th___ day of ___December___, 2005.

Robert E. Crowley
Justice, Superior Court

Date Filed __JUNE 8 2005__ ___CUMBERLAND___ Docket No. ___AP-05-34___
County

Action __80B APPEAL__

SEAFORTH HOUSING, LLC                    CITY OF PORTLAND
                                         WATERVIEW DEVELOPMENT, LLC

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| DAVID M HIRSHON ESQ | PENNY LITTELL ESQ (CITY OF PORTLAND) |
| MARSHALL J TINKLE ESQ | 389 CONGRESS STREET |
| 3 CANAL PLAZA | PORTLAND MAINE 04101 |
| PO BOX 15060 | (207)874-8480 |
| PORTLAND MAINE 04112-5060 | Patrick Scully, Esq. (PII Waterview) |
| (207)874-6700 | 100 Middle Street |
| | PO Box 9729 |
| | Portland, ME 04104-5029 |
| | 774-1200 |

Date of
Entry